**F I L E D**
**United States Court of Appeals**
**Tenth Circuit**

**July 21, 2006**

**Elisabeth A. Shumaker**
**Clerk of Court**

PUBLISH

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

HAIMANOT SOLOMON,

Petitioner,

v.

ALBERTO R. GONZALES, United
States Attorney General,

Respondent.

No. 05-9522

**PETITION FOR REVIEW OF THE DECISION OF THE**
**BOARD OF IMMIGRATION APPEALS**
**(Immigration File A79 417 309)**

Nathan Kunz, Student Attorney, supervised by Timothy M. Hurley (Timothy M.
Hurley on the briefs), University of Denver, Sturm College of Law, Federal
Appellate Clinic, Denver, Colorado, for Petitioner.

Elizabeth A. Weishaupl, Assistant United States Attorney (William J. Leone,
United States Attorney, with her on the brief), Office of the United States
Attorney, Denver, Colorado, for Respondent.

Before **McCONNELL**, **ANDERSON**, and **TYMKOVICH**, Circuit Judges.

**McCONNELL**, Circuit Judge.

Haimanot Solomon, a former resident of Ethiopia and Eritrea of mixed

ancestry, seeks asylum in the United States, claiming that she was expelled from

Ethiopia on account of her Eritrean paternity and was persecuted in Eritrea on account of her Ethiopian maternity, language, and upbringing. She challenges the decision of the Immigration Judge (IJ), which was affirmed by the Board of Immigration Appeals (BIA), that she did not present credible claims for asylum, restriction on removal under the Immigration and Nationality Act (INA), and withholding of removal under the United Nations Convention Against Torture. Because the IJ's adverse credibility determination was not based on "substantial evidence" and supported by "specific, cogent reasons," we **GRANT** the petition for review, **VACATE** the decision of the BIA affirming the IJ's order, and **REMAND** to the BIA for further proceedings.

## I. Factual and Procedural Background

In 1979, Haimanot Solomon was born to an Ethiopian mother and Eritrean father in Addis Ababa, capital of Ethiopia.[1] She lived in Ethiopia until she was 19. One night in 1998, she says, armed officers seized and imprisoned her, because her father is Eritrean. She recounts being questioned by the police and being taken on a three-day bus journey to the Eritrean border. At the end of the journey, she was forced across mined ground and taken by United Nations

---

[1]In the factual section of its brief the Government recites, as if uncontested, all of Ms. Solomon's claims regarding the facts of this case, including that her mother is Ethiopian and that she lived in Ethiopia until she was nineteen. Yet in the argument section, the Government defends the IJ's adverse credibility determination on these points. This makes it difficult for the Court to determine what facts the government deems to be material and disputed.

workers to a refugee camp. Ms. Solomon was then conscripted into the Eritrean military and sent for training at Sawa, a military camp. Ms. Solomon tells of extreme mistreatment—being beaten, tied hand and foot and left facing the sun, forced to carry containers of water back and forth, and made to sleep on the ground amid sheep's blood. Ms. Solomon attributes this mistreatment to her being part Ethiopian, a fact easily discovered at the military camp because she had not yet learned Tigrinya, the dominant language in Eritrea. After several years of mistreatment, Ms. Solomon deserted. A bus driver smuggled her to Asmara, and from there a friend arranged for her to leave the country. On August 15, 2001, she traveled to Miami with a man named Kubrum, who left her with an Eritrean passport that was missing thirteen pages, and she was promptly taken into custody by U.S. immigration officials. Ms. Solomon was then paroled to Denver, where one of her sisters lives.

On February 12, 2002, Ms. Solomon appeared for a hearing and requested political asylum, restriction on removal, and relief under the Convention Against Torture. On May 22, 2002, she filed her application for asylum. On September 3, 2003, the Immigration Judge (IJ) held the merits hearing for Ms. Solomon's claims, at which she testified at length regarding her experiences and submitted into evidence, among other materials, her Eritrean passport, an affidavit from her half-sister corroborating her mother's Ethiopian citizenship, and the then-current State Department country report on Eritrea. She explained that her mistreatment

in Eritrea was due to her mixed Ethiopian ancestry and upbringing. Her testimony was delivered in Amharic, the principal and official language of Ethiopia. During the hearing, the IJ asked whether she had any documents showing she was from Ethiopia. Ms. Solomon answered that she had possessed an ID card, but that "when I left Ethiopia I left empty-handed [and] [w]hen I left Eritrea I left empty-handed." R. 162-63.

The IJ announced his oral decision at the conclusion of the hearing, rejecting all of Ms. Solomon's claims for relief. The decision was based entirely on an adverse credibility finding. The IJ apparently disbelieved Ms. Solomon's testimony that one of her parents is Ethiopian and that she was raised in Ethiopia. The IJ expressed no skepticism regarding Ms. Solomon's account of her mistreatment in Eritrea.

Ms. Solomon filed an appeal with the Board of Immigration Appeals (BIA). As attachments to her brief, she submitted substantial evidence of her Ethiopian parentage and upbringing: a report card from the Ethiopian Ministry of Education, a baptismal certificate from the Ethiopian Orthodox Tewahedo Church, a statement from an Ethiopian official that she was the daughter of Mrs. Adanech Alelmayehu of Kebele, Ethiopia, and a statement from Mrs. Alelmayehu that Ms. Solomon was her daughter. The BIA affirmed the IJ's decision in a single-member brief opinion. The BIA did not consider the additional documentary evidence because it was not presented to the IJ.

Ms. Solomon then filed a timely petition for review in this Court.

## II. Discussion

### A. Standard of Review

Ms. Solomon seeks three kinds of relief—asylum, restriction on removal, and withholding of removal under the Convention Against Torture. To be entitled to asylum, Ms. Solomon must establish that she is a "refugee[] as defined in 8 U.S.C. § 1101(a)(42)(A), and then persuade the Attorney General to exercise his discretion to grant relief under 8 U.S.C. § 1158(b)." *Batalova v. Ashcroft*, 355 F.3d 1246, 1254 (10th Cir. 2004). To establish that she is a refugee, Ms. Solomon must show that she is unwilling or unable to return to Eritrea because of past persecution or a "well-founded fear" of future persecution, which is "on account of race, religion, nationality, membership in a particular social group, or political opinion." 8 U.SC. § 1101(a)(42)(A). If Ms. Solomon cannot establish a well-founded fear under the asylum standard, she will necessarily fail to meet the higher standards required for restriction on removal under the INA or withholding of removal under the Convention Against Torture. *Uanreroro v. Gonzales*, 443 F.3d 1197, 1202 (10th Cir. 2006).

Our review of this matter might seem to be colored by the fact that, in her appeal to the BIA, Ms. Solomon submitted such powerful documentary evidence of her Ethiopian parentage and upbringing that there can be no serious doubt that the IJ's disbelief of her claim on this score was wrong. Knowing that Ms.

Solomon has provided her baptismal certificate, her Ethiopian school report card, a letter from her mother, and a statement from an Ethiopian official that her mother is an Ethiopian citizen, we cannot doubt that Ms. Solomon is, in fact, of partial Ethiopian parentage and was raised in Ethiopia. The remainder of her story—that she was expelled to Eritrea on account of her father's Eritrean nationality, that she was conscripted into the Eritrea military, and that she was severely abused and mistreated in the Eritrean military on account of her perceived Ethiopian nationality—has not been questioned, at least at this stage of the proceedings. We are frankly surprised that the government persists in defending the BIA's decision, rather than acquiescing in a remand in the interest of justice.

But as an appellate court our authority is tightly circumscribed by statute. The question before us is not whether Ms. Solomon is of Ethiopian ethnicity, whether she suffered persecution on that account, or whether she is entitled to asylum, but solely whether the decision of the BIA was "supported by reasonable, substantial and probative evidence on the record as a whole." *Krastev v. INS*, 292 F.3d 1268, 1275 (10th Cir. 2002); *see Yuk v. Ashcroft*, 355 F.3d 1222, 1233 (10th Cir. 2004).[2] Moreover, the U.S. Citizenship and Immigration Services (formerly

_____

[2]Because the BIA affirmed in a single-member brief opinion, "we will not affirm on grounds raised in the IJ decision unless they are relied upon by the BIA in its affirmance," although "we are not precluded from consulting the IJ's more complete explanation of those same grounds." *Uanreroro*, 443 F.3d at 1204.

the Immigration and Naturalization Service) properly has procedural rules governing the introduction of evidence, and under those rules the baptismal certificate, the report card, and the statements from Ms. Solomon's mother and the Ethiopian official were not timely submitted and are not an official part of the record. *See Matter of Fedorenko*, 19 I. & N. Dec. 57, 74 (BIA 1984). Ms. Solomon's counsel apparently did not move for a continuance before the IJ to enable her to obtain and submit additional documentation, or move before the BIA to reopen the proceeding for receipt of new evidence. Our task, therefore, is to determine whether the BIA's affirmance of the IJ's credibility finding against Ms. Solomon was supported by substantial evidence, based on the record as it then existed.

The courts of appeals have frequently noted the inherent problems with credibility determinations in asylum cases. *See, e.g.*, *Djouma v. Gonzales*, 429 F.3d 685, 687-88 (7th Cir. 2005) (noting the difficulty of determining credibility and the lack of empirical evidence for when applicants are lying or telling the truth). Asylum applicants rarely speak English, and their testimony is plagued with the uncertainties of translation and cultural misunderstanding. They are generally unfamiliar with American procedures and wary of lawyers and officials; often they are not well served even by their own legal counsel. Their escape from persecution sometimes entailed acts of deceit and prevarication, or even bribery or forgery, which complicates evaluation of their veracity in immigration

proceedings.  Moreover, because of their troubled relations with their native countries, purported refugees often have difficulty in obtaining documentation to back up their claims.  *See Wiransane v. Ashcroft*, 366 F.3d 889, 897 (10th Cir. 2004).  Accordingly, this Court has held that we will affirm a denial of asylum based on an adverse credibility finding only if the IJ or the BIA has presented "specific, cogent reasons" for the finding.  *Wiransane*, 366 at 897-98 (internal quotation marks omitted); *see Chaib v. Ashcroft*, 397 F.3d 1273, 1278 (10th Cir.2005) (internal citations and quotations omitted) ("An IJ's finding that an applicant's testimony is implausible may not be based upon speculation, conjecture, or unsupported personal opinion . . . [but] must be supported by substantial evidence in the record.").  As discussed more fully below, in most cases lack of documentary corroboration does not, in itself, constitute substantial evidence to support an adverse credibility determination.

**B.  The BIA's Findings In This Case**

One question before the IJ and the BIA was whether to believe Ms. Solomon's claim that she is of Ethiopian nationality.  As noted above, Ms. Solomon testified at length at the hearing before the IJ, unequivocally stating that she was born to an Ethiopian mother and was raised, until the age of 19, in Addis Ababa.  On the record, there appears no reason to be skeptical of her claim.  Ms. Solomon spoke in Amharic, the principal and official language of Ethiopia, rather than in Tigrinya, the principal language of Eritrea.  The IJ does not mention

anything in her demeanor that cast doubt on her veracity, and the IJ noted that from the time Ms. Solomon first entered the United States through the merits hearing, she "has consistently indicated that her mother is Ethiopian." Oral Decision of the Immigration Judge 6. No evidence was presented that contradicted any aspect of her story. She submitted an affidavit from her half-sister, an American resident, in support of her Ethiopian parentage. She provided an explanation for her lack of official documents. The IJ did not suggest that Ms. Solomon's story is inherently implausible, and sadly it is not; the State Department Country Report included in the record describes the beatings and severe mistreatment inflicted on Ethiopian deportees who were also thought to be evading military service.

The BIA offered three reasons for the adverse credibility finding in this case: (1) "the respondent's submission of an Eritrean passport that had several missing pages," (2) "the respondent's failure to present the testimony of her sisters, who are presently residing in the United States," and (3) "the lack of documentary evidence corroborating the respondent's testimony." Decision of the Board of Immigration Appeals 1. Each of these reasons was elaborated by the IJ.

The third reason is the most easily disposed of. This Court has held that an asylum applicant's otherwise credible testimony constitutes sufficient evidence to support an application, *Uanreroro*, 443 F.3d at 1205; *Sviridov v. Ashcroft*, 358 F.3d 722, 727 (10th Cir. 2004) (noting that "an alien's testimony alone may

support an application for withholding of removal or asylum"). The mere absence of "[c]orroborating documentary evidence" for the applicant's ethnicity, standing alone, is not a legally sufficient basis for an adverse credibility finding. *Wiransane*, 366 F.3d at 898 (reversing an adverse credibility determination that was based on the absence of all evidence except the applicant's testimony). In finding Ms. Solomon not credible about her mother's nationality, "the IJ appears to have confused lack of corroboration with lack of credibility." *Obale v. Attorney General of the United States*, — F.3d —, 2006 WL 1699954 at \*7 (3d Cir. June 22, 2006).

To be sure, there will be cases where an applicant's failure to produce decisive and readily available corroborating evidence is so telling, and the reasons for failure to produce the evidence so feeble or implausible, that an IJ may legitimately doubt the applicant's credibility. This is not such a case. Going into the hearing, Ms. Solomon had no reason to expect that her testimony, coupled with her fluency in Amharic and the affidavit from her half-sister, would not suffice to support her claim of Ethiopian nationality. Moreover, her responses to the IJ's questions about documentation seem both plausible and reasonable:

> Q. Do you have any documents to show that you are from Ethiopia?
> A. I used to have an i.d. but I didn't bring it.
> Q. Well, my question is, do you have any documents right now in this country to prove that you are from Ethiopia?
> A. Everything is in Ethiopia. My mom has every, all the i.d.s that—
> Q. Your answer is no, you don't have any documents in this country to prove that you are from Ethiopia?

A. No, I have nothing here. I came with, when I left Ethiopia I left empty handed. When I left Eritrea I left empty-handed. I don't have anything.

Tr. of Hr'g, September 3, 2003, 57-58. This Court has recognized "the inherent difficulties a purported refugee may have in obtaining documentation to back up his claims." *Wirasane*, 366 F.3d at 897. Ms. Solomon's explanation for her lack of documents—that she left Ethiopia and then Eritrea "empty-handed"—precisely fits that description.

The BIA's next reason in support of the adverse credibility determination is that Ms. Solomon entered the United States with "an Eritrean passport that had several missing pages." Decision of the Board of Immigration Appeals 1. The IJ explained the point more fully:

> The passport that she had when she arrived in Miami is in the record as Exhibit 4. The passport appears to be genuine. There are missing pages. The passport is in the respondent's name. It was issued January 11th, 2000. This would seem to contradict the respondent's testimony that she got the passport on the eve of her departure from Eritrea. The passport is an Eritrean passport. The Court believes that the possession of an Eritrean passport will indicate that the respondent is of Eritrean citizenship. The Court has noted above that there are missing pages in the passport. There appear to be about 10 or 12 missing pages. The pages were torn out of the passport. The respondent was asked as to why these pages were missing from her passport and she was unable to provide any explanation for that. The most logical explanation for missing pages in the passport is that they contain information which someone is seeking to obscure. We can't know what is on those passport pages and yet the Court believes that the defacement of the passport in this way does indicate an intent to hide certain information either by the respondent or by someone acting on her behalf. The passport would seem to indicate that the respondent is of Eritrean citizenship. There is nothing in the

-11-

documents that would indicate that that's not correct. The Court believes that the record in this case would show that the respondent is of Eritrean citizenship. The background material would seem to indicate that she would be eligible for such citizenship based on the ethnicity of her father.

. . . .

[T]he Court is then confronted with its original observation that the respondent or someone on her behalf has been concealing information. The Court did make this observation with respect to the passport that had missing pages. The Court simply does not know what information has been concealed and what has been revealed . . . .

Oral Decision of the Immigration Judge 3-4, 7. As elaborated by the IJ, this reason for disbelieving Ms. Solomon has two components: (1) the passport indicates that Ms. Solomon is actually Eritrean, and (2) the missing pages suggest an attempt to deceive the court.

The first subpoint is not persuasive. Ms. Solomon's citizenship is far from clear, but the fact that she obtained an Eritrean passport through clandestine channels proves nothing about her citizenship, one way or the other. Even if we take Ms. Solomon's Eritrean citizenship as established, however, it does not undermine her claim. Ms. Solomon testified to having an Ethiopian mother and an Eritrean father, and to having spent her first nineteen years in Ethiopia and the next several in Eritrea. She claims to have been persecuted in Eritrea on account of her perceived Ethiopian nationality—that is, her Ethiopian parentage, language, and upbringing—not her citizenship. The passport casts no doubt on

-12-

that claim. Ms. Solomon could be a citizen of Eritrea for official purposes, and still be perceived and treated as an Ethiopian.

Nor do the missing thirteen pages amount to "substantial evidence" that Ms. Solomon was attempting to deceive the court with regard to her ethnicity. According to her testimony, Ms. Solomon received the passport from a man named Kubrum who accompanied her to the Miami airport. The details are sketchy, but it seems unlikely that Mr. "Kubrum" was the Eritrean official in charge of issuing passports. Although it would not be surprising if deception was involved in the procurement of the passport, there is no reason to think the purpose of the deception was to mislead the court rather than to get out of Eritrea. *See Uanreroro*, 443 F.3d at 1211 ("lying to gain entry to the United States may be entirely consistent with fleeing persecution"). Ms. Solomon testified that she does not know why the pages are missing. That could suggest that Ms. Solomon is persisting in a plot to deceive U.S officials and the IJ about her past travels, or it could be the plain and simple truth: she was given the passport as-is by Kubrum, and she cannot tell what she does not know. In *Uanreroro*, 443 F.3d at 1211, we held that lying to gain entry into the United States "does not alone rise to the level of 'substantial evidence' to support an adverse decision." It follows *a fortiori* that deception to obtain documents necessary to escape persecution abroad is not substantial evidence of an intent to deceive an American court.

The final reason given by the BIA for the adverse credibility finding is Ms. Solomon's failure to have her sisters testify in person, coupled with her sister's failure to include her alien number on her affidavit. Ms. Solomon introduced an affidavit from her half-sister Hizbawit Mesgian, a resident of Aurora, Colorado. At the merits hearing, the IJ asked about the lack of live testimony:

> Q. Why can't your sisters come to court?
> A. They are at work and they have given their testimony in writing and I told them, there is no need for you to come there, this is what is necessary, Your Honor.

Tr. of Hr'g, September 3, 2003, 75. In his oral decision, the IJ considered the lack of live testimony a reason for the adverse credibility determination:

> [S]he claims her mother is Ethiopian while her father is Eritrean. The respondent has consistently indicated that her mother is Ethiopian. It's on her form I-589. She did state that in her airport statements. There is an affidavit of Hisbowik Meskian, who is the respondent's half sister, and she indicates that the respondent's mother is from Ethiopia. Despite the consistency of these statements, the Court is concerned that there is better evidence of the citizenship of the respondent's mother. No birth certificate was provided to show the identity of the mother. Respondent's passport indicates that there is a national i.d. card. Perhaps that would be helpful in this regard, but that card was not provided.
>
> The Court is concerned, also, that the respondent does have a very good source of information regarding her parentage and that would be her sisters. Apparently she has two sisters in the United States. Neither sister was present in Court to testify in support of the respondent. The affidavit provided by the one sister does not provide her alien number, although she testifies she came to the United States as a refugee in the year 2001. With her alien number, with her testimony before the Court, the veracity of her information could be checked by reference to her own file. The Court would find her testimony before the Court under oath, after having disclosed her

-14-

own alien number, to have been most likely reliable. As it is, the
testimony is of very limited evidentiary value . . . .

Oral Decision of the Immigration Judge 6-7.

For much the same reasons we rejected the lack of Ms. Solomon's own
documents as substantial evidence in support of an adverse credibility
determination, we hold that the absence of live testimony by her sisters is not
substantial evidence. As discussed above, Ms. Solomon's own testimony is
legally sufficient to support her claim of Ethiopian nationality, and the IJ's
dissatisfaction with Ms. Meskian's affidavit is simply another version of the
argument that the applicant lacks credibility because she lacks corroboration.

Indeed, in this instance, the applicant submitted corroborating evidence.
Neither the IJ nor the government's appellate counsel has pointed us to anything
in the agency's rules that suggests that an affidavit may not be submitted in lieu
of live testimony, or that an affidavit filed by a resident alien is inadmissible or
incredible unless the alien supplies an alien number. We do not dispute that an IJ,
in his discretion, may request additional evidence or corroboration where
appropriate. But when an applicant for asylum has submitted relevant evidence in
compliance with the agency's rules, the IJ may not treat the absence of additional
formalities as a basis for an adverse credibility determination without affording
the applicant a reasonable opportunity to comply with the IJ's demands.

## Conclusion

We therefore conclude that the reasons given by the BIA and elaborated by the IJ are not substantial evidence for the adverse credibility finding, and we remand to the agency for further proceedings. *Elzour v. Ashcroft*, 378 F.3d 1143, 1150 (10th Cir. 2004). As some time has elapsed since Ms. Solomon's initial hearing, conditions in Eritrea may have improved or grown worse. A more recent country report is now available from the State Department, and the IJ should consider the current conditions in Eritrea on remand. *See Wiransane*, 366 F.3d at 898.

For the foregoing reasons, we **GRANT** the petition for review, **VACATE** the decision of the BIA affirming the IJ's order, and **REMAND** to the BIA for further proceedings consistent with this opinion.